UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CARMEN ROSARIO, *pro se*, o/b/o I.R.,   :
              :
      Plaintiff,   :
              :  **OPINION & ORDER**
   -against-     :  14-CV-1605 (DLI)
              :
COMMISSIONER OF SOCIAL SECURITY,  :
              :
      Defendant.  :
-------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On March 24, 2011, Plaintiff Carmen Rosario ("Plaintiff") filed an application *pro se* for

Supplemental Security Income ("SSI") under the Social Security Act (the "Act") on behalf of her

minor son, I.R., alleging that I.R. suffered from severe behavioral problems, poor motor skills,

high fevers, and migraines, *inter alia*. (*See* Certified Administrative Record ("R.") 116, Dkt.

Entry No. 23.) On June 10, 2011, this application was denied and Plaintiff requested a hearing.

(R. 60-64, 102-108.) On September 6, 2012, Plaintiff and I.R. appeared *pro se* and testified at a

hearing before Administrative Law Judge Valerie Stefanelli ("the ALJ"). (R. 9, 37-59.) By a

decision dated October 19, 2012, the ALJ concluded that I.R. was not disabled within the

meaning of the Act. (R. 6-23.) On December 26, 2013, the ALJ's decision became the

Commissioner's final decision when the Appeals Council denied Plaintiff's request for review.

(R. 2-4.)

Plaintiff filed the instant appeal, *pro se*[1], seeking judicial review of the denial of benefits,

pursuant to 42 U.S.C. § 405(g). (*See* Complaint ("Compl."), Dkt. Entry No. 1.) The

---

[1]   *Pro se* pleadings are held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (citation omitted). Courts should "interpret [such papers] to raise the strongest arguments that they suggest." *Forsyth v. Fed'n Emp't & Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005) (citation and quotation marks omitted). Though a court need not act as an advocate for *pro se* litigants, in such cases "there is a greater burden and a correlative greater responsibility upon the district court to insure that constitutional

Commissioner moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking affirmance of the denial of benefits. (*See* Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem."), Dkt. Entry No. 21.) The Court liberally construes Plaintiff's submission in response to the denial of I.R.'s SSI benefits. (*See* Plaintiffs' April 14, 2015 Letter, Dkt. Entry No. 16.) For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is granted.

## BACKGROUND[2]

### I.      Non-Medical and Self-Reported Evidence

I.R. was born in 2002 and, at the time of the ALJ's decision, was 10 years old and entering the fourth grade. (R. 12, 13, 102.)

According to a disability report dated April 14, 2011, Plaintiff reported that I.R. had been disabled since June 8, 2004 due to severe behavioral problems, poor motor skills, high fevers, and migraine headaches. (R. 116.) Prior to the filing of the SSI application, I.R. had received therapy and counseling for these emotional and physical infirmities. (R. 117.)

### A.  Social Security Administration ("SSA") Function Report

In a function report dated April 14, 2011, Plaintiff noted that I.R.'s ability to communicate was limited. (R. 124-33, 127.) Plaintiff also stated that I.R. was able to do the following with no problems: (1) print some letters and his name; (2) spell most three to four letter words; (3) add and subtract numbers over ten; and (4) recognize the days of the week and months of the year. (R. 128.) However, Plaintiff reported that I.R. could not perform the

---

deprivations are redressed and that justice is done." *Davis v. Kelly*, 160 F.3d 917, 922 (2d Cir. 1998) (citation omitted).

[2]      After an exhaustive review of the administrative record and the Commissioner's submissions, the Court finds that the recitation of facts contained in the Commissioner's Memorandum of Law is accurate. Therefore, the fact summary contained in the Background Section of this Opinion & Order is largely taken from the Commissioner's Memorandum of Law.

following tasks:  (1) write a simple story containing six to seven sentences; (2) write in longhand; (3) understand money; or (4) tell time.  (*Id*.)  Plaintiff further noted that I.R.'s impairments affected his behavior with other people, as he easily was agitated and very emotional.  (R. 130.)  However, I.R. had friends, was able to make new friends, and played team sports.  (*Id*.)  Plaintiff found that I.R. generally got along with other adults.  (*Id*.)

Nonetheless, Plaintiff believed that I.R.'s ability to help himself and cooperate with others in taking care of his personal needs was affected.  (R. 131.)  Plaintiff found that I.R. was unable to perform the following self-care tasks:  (1) tie his shoelaces; (2) bathe or wash his hair; (3) select his own clothes without assistance; (4) pick up and put away his toys; (5) hang up his clothes; (6) help around the house; (7) do what he was told most of the time; (8) obey safety rules; or (9) accept criticism or correction.  (*Id*.)  I.R. was able to independently use zippers, button clothes, brush his teeth, comb his hair, and eat using utensils.  (*Id*.)

Plaintiff further stated that I.R. got to school on time.  (*Id*.)  However, she noted that I.R.'s ability to pay attention and stay with a task was limited.  (R. 132.)  I.R. did not finish tasks, work on arts and crafts projects, complete homework assignments, or complete household chores most of the time.  (*Id*.)  He did keep busy on his own and his physical abilities were not limited. (R. 129.)

**B.  SSA Childhood Activities Report**

In an SSA "childhood activities" report dated April 21, 2011, Plaintiff stated that I.R. was "very hyper" and "very rough" around other people.  (R. 32-33.)  He did not talk much with adults, and when he was told that he did something wrong, he cried and got very upset and had become more violent.  (R. 32.)  When playing with other children or by himself, I.R. screamed often and always wanted to "play fighting."  (*Id*.)  Sometimes his speech did not make sense.

3

(*Id*.)  He did not finish his homework on time, and sometimes did not know what to do to complete them.  (*Id*.)  I.R. frequently forgot what he was taught.  (*Id*.)

With regard to school performance, Plaintiff noted that I.R. did not pay attention, was easily distracted, and failed his class.  (*Id*.)  His seat had to be changed because he talked while the teacher was talking.  (*Id*.)  I.R. gave Plaintiff a "hard time" in the mornings, but did not have any problems with self-care or the ability to move or walk.  (*Id*.)  However, he would wake up at night screaming and crying, and he also sleepwalked.  (*Id*.)

### C.  Post-SSI Application Disability Reports

In a disability report submitted after I.R.'s application was denied, Plaintiff stated that he had become more violent and aggressive, and that his sleepwalking had increased.  (R. 136-40.) Plaintiff also reported that I.R. suffered from more migraine headaches.  (R. 136.)  He did not pay attention.  (R. 139.)  I.R. also did not shower unless forced to and he wanted to eat every 15 minutes.  (*Id*.)  On July 28, 2011, he was treated at Wyckoff Heights Medical Center ("Wyckoff") for migraines, asthma, and given a general physical checkup.  (R. 137-38.)  Doctors at Wyckoff prescribed I.R. Albuterol for asthma and Promethazine for migraines.  (R. 139.) Neither medication resulted in side effects.  (*Id*.)

In forms dated June 28, 2012, Plaintiff listed I.R.'s medications as:  Concerta (taken daily to help I.R. focus, concentrate, and calm down); Promethazine (taken every six hours for migraines); Siladryl elixir (an antihistamine taken daily at bedtime to help him sleep); and Albuterol (taken as needed to treat I.R.'s asthma).  (R. 166, 434.)  Dr. Gina Reynoso, I.R.'s pediatrician at Wyckoff, diagnosed him with Attention Deficit Hyperactivity Disorder ("ADHD"), anxiety, and claustrophobia.  (R. 47, 434.)  Plaintiff also stated that I.R. recently had been admitted to Brookdale Hospital for observation because he was hearing voices.  (R. 434.)

On September 6, 2012, Plaintiff listed I.R.'s medications as Concerta, Siladryl, Benylinin and Quetiapine on an SSA disability review form. (R. 198.) I.R. had been evaluated by New York Psychotherapy and Counseling Center ("NYPCC") psychiatrists Dr. Patrick Plantin and Dr. David Molina. (R. 197, 759.) Dr. Plantin evaluated I.R. from May 2, 2011 to January 26, 2012, while Dr. Molina evaluated him from February 2, 2012 to September 6, 2012. (R. 197.) A handwritten note stated: "Patient has been diagnosed with ADHD – inattentive type (314.00). He is being treated with medication and verbal therapies. Patient continues to exhibit marked symptoms that interfere with overall functioning." (*Id.*)

### D. Plaintiff's Testimony Before the ALJ

On September 6, 2012, the ALJ heard testimony from both Plaintiff and I.R. during a disability hearing. (R. 41-42.) After being informed of her right to be represented by counsel for the hearing, Plaintiff elected to proceed *pro se*. (R. 39-40.)

Plaintiff testified that I.R. was 10 years old and would be starting the fourth grade after having repeated the second grade. (R. 41-42.) Plaintiff informed the ALJ that I.R. had been receiving SSI since he was two or three years old; however, disability benefits stopped in February 2010 because Plaintiff missed an appointment for recertification. (R. 42-43.) Plaintiff did not appeal or reapply for disability benefits for I.R. until March 2011 due to a "personal issue." (R. 43.)

Plaintiff further testified that I.R. was disabled because he could not stay focused and was unable to stay still. (R. 43, 46-47, 49.) Since August 2011, medication had been prescribed to I.R. to help him sleep and concentrate. (R. 43, 45.) Current medications, such as Concerta, helped I.R., but he still had difficulty remaining still. (R. 45-46, 49.) I.R. demonstrated a

constant urge to try new things and to touch things. (*Id.*) An increase in his medication did not stop him from "jumping around." (R. 45-46.)

Plaintiff stated that I.R. experienced intense migraine headaches that caused him to vomit and miss a substantial amount of school. (R. 47.) Dr. Reynoso treated I.R. for migraines; however, Plaintiff only took I.R. for such treatment when he did not stop vomiting. (*Id.*) I.R. suffered from migraine headaches approximately two or three time per week. (R. 48.) I.R. only took medication when he had a headache and the medication made him sleepy. (R. 50.)

I.R. received therapy from the Brooklyn Heights Clinic for several months; however, the therapy sessions were discontinued because Plaintiff had trouble getting I.R. to his appointments on time. (R. 45, 47, 57.) I.R. often would not cooperate with Plaintiff en route to these sessions, thus causing Plaintiff and I.R. to be late. (R. 57-58.)

Plaintiff also stated that I.R. will play with an iPhone, an iPod or with video games for brief periods of time, after which he gets bored. (R. 49.) I.R. will interact with Plaintiff, but will throw temper tantrums that are triggered by inconsequential things. (*Id.*) I.R. also has difficulty controlling his temper at school. (*Id.*) I.R. is claustrophobic and will scream if anyone tries to hold him when he is having a claustrophobic episode. (*Id.*)

I.R. has a few friends, but some schoolchildren teased him about the prospect of him going to a special education class. (*Id.*) As an alternative to a special education class, I.R.'s school placed him in a smaller classroom with approximately twenty children and two teachers. (*Id.*) I.R. did not like to do homework and Plaintiff often had to sit with him in order to ensure that his homework assignments were completed. (R. 50.) Plaintiff informed the ALJ that I.R. spent most of his time at school distracted and talking with other people. (*Id.*)

**E. I.R.'s Testimony Before the ALJ**

I.R. testified that he looked forward to going to school "a little bit," but he did not like school.  (R. 51, 52.)  Although he could read and did not have difficulty doing so, I.R. did not like reading.  (R. 52.)  I.R. stated that he enjoyed writing and that math was his favorite subject.  (R. 52, 54.)  He told the ALJ that he did his homework.  (R. 54.)

I.R. had friends at school and they would play tic-tac-toe and other games during the lunch period.  (R. 52.)  I.R. also enjoyed playing tag, basketball, football and video games.  (R. 53-54.)

I.R. further testified that he took medication every day and felt better after doing so.  (R. 54, 55.)  He said that he would get in trouble at home when he was "bad" or failed to complete his chores as instructed, such as washing the dishes.  (R. 56.)  I.R. also said that sometimes he would get into trouble at school for talking during class when the teacher was talking.  (*Id*.)

At the conclusion of I.R.'s testimony, Plaintiff questioned the veracity of I.R.'s statements and opined that I.R. was not being truthful because he believed that he would get in trouble for telling the truth.  (R. 56-57.)  Specifically, Plaintiff told the ALJ that I.R. did not like math and that I.R. often did not remember the question he had just been asked.  (R. 57.)

## II.    Educational Evidence

### A.  Second Grade

I.R.'s second grade report card for the end of the 2010-2011 school year reflected the following academic performance:  (1) met grade level in reading, arts, technology, and literacy writing and reading; (2) approached grade level in listening and speaking, math, science, and social studies; (3) was far below grade level in writing and personal and social growth.  (R. 167-68.)

At the end of the second marking period, I.R.'s teacher noted that he only had been with the class for a short time, so it was difficult to give him a grade. (R. 169.) Her initial observation was that I.R. appeared to be on grade level, but he required encouragement to complete his homework assignments. (*Id.*)

At the end of the final marking period, I.R.'s teacher noted that he easily was distracted in school and needed to improve his work habits. (*Id.*) The teacher further noted that I.R. was reading on grade level, but his math and writing skills were below grade level. (*Id.*) For the entire second grade year, I.R. had been absent 21 days and late 6 days. (*Id.*) He was promoted to the third grade. (*Id.*)

## B. Intelligence Tests

Due to his academic difficulties, Plaintiff requested that school psychologist Karen Haynes ("Haynes") administer two intelligence tests to I.R.: (1) the Wechsler Intelligence Scale for Children-4[th] Edition ("WISC-IV") and (2) the Woodcock-Johnson III Achievement Test. (R. 186-91). The tests were administered on October 3, 2011 and November 1, 2011, respectively. (R. 186.) I.R. was 9 years old and in a third grade general education class when the tests were administered. (*Id.*) I.R. appeared focused and attentive to the testing situation. (*Id.*)

### 1. WISC-IV Test Results

The WISC-IV test scores show how well I.R. performed compared to children the same age from across the United States. (R. 187.) The highest possible score in any test subject is 160 and the lowest possible score is 40. (*Id.*) Scores from 90 to 109 are considered average. (*Id.*) I.R. achieved the following scores on the WISC-IV: (1) 85 in verbal comprehension (low average qualitative range); (2) 73 in perceptual reasoning (borderline qualitative range); (3) 104 in working memory (average qualitative range); (4) 65 in processing speed (extremely low

qualitative range); and (5) 76 in full scale IQ (borderline qualitative range).  (*Id*.)  I.R.'s IQ score indicates that he "may find it difficult to keep up with other children his age when [general] thinking and reasoning skills are needed."  (R. 188.)

### 2.  Woodcock-Johnson III Achievement Test Results

I.R. achieved the following scores on the Woodcock-Johnson III Achievement Test:  (1) K.9 in letter-word identification; (2) 2.3 in reading fluency; (3) 1.3 in passage comprehension; (4) 2.4 in calculation; (5) 2.7 in math fluency; (6) 1.8 in story recall; (7) less than K.0 in understanding direction; (8) 2.6 in spelling; (9) 4.2 in writing fluency; and (10) 1.9 in writing samples.  (R. 188-89.)  The Woodcock-Johnson III test revealed that I.R.'s overall academic skills were at a second grade level.  (R. 191.)  Specifically, the test revealed that I.R. performed at a first grade level with his math and oral language skills, while he performed at a 4.4 grade level with his overall writing skills.  (*Id*.)

Based on both WISC-IV and Woodcock-Johnson III test results, Haynes recommended that I.R. be classified as having a learning disability.  (*Id*.)  She further recommended that I.R. be moved from general education to integrated co-teaching ("ICT") and that I.R. continue with outside counseling.  (*Id*.)

### C.  Third Grade

### 1.  Teacher Report

In a report dated November 21, 2011, third grade teacher Pam McComb ("McComb") stated that, based on the results of an exam administered on September 20, 2011, I.R. performed at a second grade level in reading and comprehension.  (R. 192-96.)  McComb noted that I.R. could read and comprehend very well when he was alone with her, but he got lost when reading with the class.  (R. 192.)  She also found that I.R.'s handwriting was very small and sometimes

difficult to read.  (R. 192, 194.)  I.R.'s math score from November 17, 2011 was 1, but McComb estimated that his math skills were at a second grade level.  (R. 192-93.)  With respect to math, she noted that I.R. understood the material when working as a class, but not when working alone.  (R. 193.)  McComb further noted that I.R.'s work was satisfactory in science but unsatisfactory in social studies.  (*Id*.)  I.R.'s attendance, punctuality, grooming, and attire were all deemed satisfactory by McComb.  (*Id*.)

McComb stated that I.R. had difficulty focusing on his writing, and had not finished a writing assignment on Mexico notwithstanding the two-week extension that she granted him.  (R. 194.)  I.R. was very distracted, would laugh at everything, and required constant redirection of his attention.  (*Id*.)  I.R. was incapable of working alone and McComb needed to sit next to him to get him to work.  (*Id*.)  His ability to retain information depended on the subject and how it was being taught.  (*Id*.)  I.R. followed directions only after being told to do so several times.  (*Id*.)  His responsiveness to new tasks was slow and his work pace was very slow.  (*Id*.)  Although I.R. demonstrated self-control, he had verbal issues with other students.  (*Id*.)  Nonetheless, I.R. was able to get along with peers and adults most of the time.  (*Id*.)

McComb completed a psychiatric referral form as a part of this report in which she stated that I.R. was easily distracted and lacked focus in a "whole group," but was able to work in a small group.  (R. 195-96.)  She further noted that I.R. was not being mainstreamed.  (R. 196.)

### 2.  Third Grade Report Card

I.R.'s third grade report card for the end of the 2011-2012 school year was completed by teachers McComb, Virginia Metz ("Metz"), and Lindsay Nodelman ("Nodelman").  (R. 170-73.)  The report card reflected the following about I.R.'s academic performance:  (1) he met grade level standards in listening and speaking, math, social studies, physical education, technology,

and art; (2) he approached grade level standards in reading, writing, science, and music; and (3) he usually demonstrated effort, worked cooperatively with others, respected class and school rules, and completed homework assignments. (R. 170-72.)

Teacher comments from the first marking period indicated that I.R. had difficulty focusing and, although he could read, his comprehension was poor. (R. 173.) The comments also stated that I.R. did not manage his time effectively and could take a while to accomplish simple tasks. (*Id*.) Teacher comments from the second marking period reflected that I.R. had adjusted well to the new ICT class. (*Id*.) The teacher noted that he was bright, but he struggled with his work independently. (*Id*.) I.R. worked well in groups and enjoyed participating when he was focused. (*Id*.) However, I.R. became distracted very easily, which created difficulty in completing tasks. (*Id*.) The teacher further noted that I.R. needed to practice reading and writing at home to build focus and fluency. (*Id*.) Overall, the teachers deemed I.R. to be a "great addition" to the class. (*Id*.) During his third grade year, I.R. had been absent 29 days and late 8 days. (*Id*.) He was promoted to the fourth grade in September 2012. (*Id*.)

### D. Individualized Education Program

On November 22, 2011, an Individualized Education Program ("IEP") plan was completed for I.R. (R. 157-65.) This IEP plan was to be implemented on November 23, 2011. (R. 157.) I.R.'s disability classification was "other health impairment." (R. 157, 164.)

The IEP noted that I.R. read well when reading alongside the teacher, but he could not read aloud in class. (R. 157.) He worked better in a group and worked much better one-on-one. (*Id*.) The IEP predicted that I.R. would be able to meet academic goals by 2011-2012. (*Id*.) With respect to I.R.'s interests, he enjoyed computers, gym and art. (*Id*.) With regard to his

functional needs, I.R. forgot directions, did not complete homework assignments, and was unable to sit still in class. (*Id.*)

In the area of social development, I.R. was personable, had friends and worked well with adults, but he lacked confidence. (*Id.*) The report mentioned Plaintiff's comments that I.R. was in constant motion at home, sleepwalked, and had a temper. (R. 157-58.)

In the area of physical development, I.R. reportedly was in satisfactory health. (R. 158.) A physical examination revealed that I.R.'s vision and hearing were both within normal limits. (*Id.*) He had a history of asthma, croup, migraine headaches and ADHD. (*Id.*) I.R. took medication for ADHD and the migraine headaches. (*Id.*) He also attended counseling outside of school once per week. (*Id.*) The report stated that I.R. had satisfactory school attendance and that he appeared appropriately groomed. (*Id.*) With respect to I.R.'s physical development needs and those of concern to Plaintiff, the report noted that I.R. required help with his ADHD, migraine headaches, sleepwalking and small handwriting that was difficult to read. (*Id.*) I.R. also required clear and concise instructions in homework and classwork. (*Id.*) The IEP report determined that, due to processing deficits, I.R. may work at a slower pace than his peers. (*Id.*)

The IEP concluded that I.R. did not need a behavioral intervention plan or other behavioral interventions. (*Id.*) The report recommended that I.R. be placed in a special education program of ICT eight periods per week in a general education classroom. (R. 160-61, 164.) I.R. was not eligible to receive special education services during July and August. (R. 161.) I.R. would participate in all State and district-wide assessments that were administered to general education students, but he would receive testing accommodations. (R. 161-62, 164.) He was not exempt from the language other than English requirement. (R. 163.) He would participate in all school activities and regular physical education, and he did not have any

medical alert.  (R. 164.)  He had no medical or physical condition that affected his learning, behavior or participation in activities.  (*Id*.)  I.R. did not require health care treatment during the school day.  (*Id*.)  His instructional/functional levels were first grade in reading and second grade in math.  (*Id*.)

### E.  School Activities and Teacher Questionnaires

#### 1.  School Activities Questionnaire

On June 18, 2012, Metz and Nodelman completed a school activities questionnaire after working with I.R. for approximately eight months.  (R. 145.)  The teachers again noted that I.R. was distracted very easily, had a short attention span and was hyperactive.  (*Id*.)  He was unable to stay focused, called out at times during class, and needed reminders to direct his attention to the task at hand.  (*Id*.)  I.R. got along well with his peers and teachers and had "great communication skills" with both peers and adults.  (*Id*.)  He responded well to changes of routine in the classroom.  (*Id*.)  The teachers also noted that I.R. demonstrated age appropriate hygiene and self-care.  (*Id*.)

#### 2.  Teacher Questionnaire

Metz and Nodelman, who taught I.R. in all subjects in his third grade ICT classroom, also completed a teacher questionnaire on June 18, 2012.  (R. 146-56.)  I.R.'s instructional levels during the 2011-2012 school year were second grade for written language and third grade for reading and math.  (R. 149.)  The teachers were asked to compare I.R.'s functioning to that of same-aged children who did not suffer from impairments and who were in regular education classes.  (*Id*.)  The questionnaire addressed six areas of testing, including:  acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for himself, health and physical well-being.  (R. 150-155.)

In the area of acquiring and using information, I.R. had no problem comprehending oral instructions and understanding and participating in class discussions.[3] (R. 150.) In that same area, I.R. exhibited a slight problem with the following: understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, providing organized oral explanations and adequate descriptions, and applying problem solving skills in class discussion. (*Id.*) The teachers detected an obvious problem with expressing ideas in written form, learning new material, and recalling and applying previously learned material. (*Id.*)

In the area of attending and completing tasks, I.R. did not have any problem executing the following tasks: paying attention when spoken to directly and organizing his own things or school materials. (R. 151.) In that same area, I.R. exhibited a slight problem with carrying out single-step instructions. (*Id.*) He had an obvious problem with the following: sustaining attention during play/sports activities, carrying out multi-step instructions, completing class/homework assignments, and working at a reasonable pace and finishing on time. (*Id.*) I.R. had a serious problem with the following: focusing long enough to finish an assigned activity or task, refocusing to task when necessary, changing from one activity to another without being disruptive, and completing work accurately without careless mistakes. (*Id.*) He had a very serious problem with waiting to take turns and working without distracting himself or others. (*Id.*)

In the area of interacting and relating with others, I.R. had no problem doing the following: making and keeping friends, respecting and obeying adults in authority, relating experiences and telling stories, using language appropriate to the situation and the listener, and

---

[3] The rating scale for this questionnaire was as follows: no problem, slight problem, obvious problem, serious problem and very serious problem. (R. 150.)

interpreting the meanings of facial expressions. (R. 152.) He exhibited a slight problem with: playing cooperatively with other children, seeking attention appropriately, and asking permission appropriately. (*Id*.) He had an obvious problem with following rules and introducing and maintaining relevant and appropriate topics of conversation. (*Id*.) I.R. exhibited a very serious problem with taking turns in conversation. (*Id*.)

In the area of moving and manipulating objects, I.R. exhibited no problems with any functions in this category of testing. (R. 153.)

In the area of caring for himself, I.R. had no problem: handling frustration appropriately, taking care of personal hygiene, caring for physical needs, identifying and appropriately asserting emotional needs, responding appropriately to changes in his own mood, and using appropriate coping skills to meet the daily demands of the school environment. (R. 154.) I.R. had a slight problem using good judgment regarding his own personal safety and dangerous circumstances. (*Id*.) He also had a slight problem knowing when to ask for help. (*Id*.) I.R. had a serious problem being patient when necessary and a very serious problem being responsible for taking needed medications. (*Id*.)

In the area of health and physical well being, the teachers indicated that, although medication is prescribed to I.R., he is not diligent about taking it. (R. 155.) The teachers also noted that I.R. frequently misses school due to illness. (*Id*.) The teachers further indicated that I.R. has difficulty working independently and often needed reminders to stay focused and on task. (R. 150.)

**III.    Medical Evidence**

**A.  Psychiatric Evaluation**

On December 23, 2010, I.R. underwent a psychiatric evaluation at the Guidance Center of Brooklyn Heights Clinic. (R. 376-80.) I.R. was 8 years old at the time of the evaluation. (R. 378.) A mental status examination revealed that I.R. was alert. (R. 379.) His behavior was cooperative and guarded. (*Id*.) His speech tested as normal. (*Id*.) He was fully oriented, had a good memory and his attention and calculation abilities were normal. (*Id*.) I.R.'s intelligence level was normal, as was his mood. (*Id*.) His affect was found to be congruent with thought content and reactive/full. (*Id*.) I.R.'s thought process was coherent, and his content and perception were normal. (*Id*.) His insight and judgment were intact. (*Id*.) I.R. was diagnosed with ADHD-type behavior problems exacerbated by post-traumatic individual and familial dysfunction. (R. 380.) I.R. received a Global Assessment of Functioning ("GAF") score of 55 (moderate symptoms).[4] (*Id*.)

The psychiatric evaluation further reported that I.R. was living with his mother and two sisters. (R. 378.) I.R.'s two sisters were ages 18 and 2, respectively, at the time of this evaluation. (*Id*.) I.R.'s father was incarcerated when I.R. was 2 years old and again when I.R. was 4 years old. (*Id*.) His father was still incarcerated when I.R. underwent this psychiatric evaluation. (*Id*.) I.R.'s mother was the victim of domestic violence by a boyfriend who had been living with the family when I.R. was 5 years old. (*Id*.) I.R. was terrified of his mother's boyfriend and had nightmares and exhibited hypervigilant behavior in the few years preceding the psychiatric evaluation. (*Id*.) He also has some difficulty separating from his mother and will not sleep alone or in the dark. (*Id*.)

---

[4] GAF is a rating of overall psychological functioning. A GAF of 51 to 60 indicates moderate symptoms or moderate difficulty in social or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders-Text Revision* 34 (4th ed., rev. 2000)(*DSM*).

I.R. is the fourth of five of his mother's children and is the only boy.  (*Id*.)  He visited his father once or twice per month.  (*Id*.)  The evaluation deemed I.R. to be an affectionate boy with a protective mother who tries to give him everything she can.  (*Id*.)

The evaluation recommended the following treatment:  (1) parent counseling and family therapy to enhance management of difficult behaviors; (2) individual and family trauma-focused therapy to address Post-Traumatic Stress Disorder ("PTSD") symptoms; (3) liaison with I.R.'s school to promote achievement and development; and (4) medication for ADHD and possible medication for PTSD.  (R. 380.)

### B.  Government Review of I.R.'s Medical File

On June 10, 2011, state agency consultative psychiatrist Dr. P. Kudler reviewed the evidence in I.R.'s file and completed a childhood disability evaluation form.  (R. 634-39.)  I.R.'s impairments were listed as PTSD and attention deficit disorder combined type.  (R. 634.)  Dr. Kudler concluded that I.R.'s impairment or combination of impairments was severe, but did not meet, medically equal or functionally equal the Listings at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.)  With respect to I.R.'s domain evaluations, Dr. Kudler concluded the following:  (1) I.R. demonstrated problems at times incorporating new material into knowledge; (2) I.R., at times, had trouble focusing, is distractible and had problems concentrating; (3) I.R. could be defiant, verbally abusive and manifested poor social judgment when dealing with others; (4) I.R. had no issues with moving or manipulating objects; (5) I.R. handled frustration inappropriately; and (6) I.R. exhibited no limitations in the area of health and physical well-being.  (R. 636-37.)

### C.  NY Psychotherapy and Counseling Center Treatment

On April 18, 2012, I.R. went to his appointment for outpatient treatment at NYPCC with his father, Carmelo Rodriguez, and was assessed by Carlos Morales ("Morales"), L.C.S.W. (R. 759, 762.) During this appointment, I.R. reported that he lived with his mother, father and siblings. (R. 759, 762-72.) The report further indicated that I.R.'s developmental milestones were within normal limits. (R. 763.) I.R.'s father informed Morales that I.R. had behavioral issues at school, but that he was not in special education. (*Id.*) I.R. previously had received services at NYPCC, but his case had been closed in January 2012 because he missed an appointment. (R. 759, 765.) I.R. currently was not receiving psychiatric or counseling services. (R. 765.) In the past, I.R. had been prescribed Concerta and Diphenhydramine, which he found to be helpful. (*Id.*) I.R. previously had been hospitalized due to a suicidal ideation/attempt. (*Id.*) Indeed, the suicide risk screening section of the report indicated that while I.R. had never tried to hurt himself, he has had thoughts about killing himself. (R. 767.) The report further revealed that, in July 2011, I.R. had been taken to Brookdale Hospital for observation due to auditory hallucinations. (R. 765.) He was discharged after 24 hours of observation. (*Id.*) I.R. did not have a history of trauma. (*Id.*)

I.R.'s father stated that I.R. was returning to psychiatric treatment in order to address his lack of attention span and difficulty with concentration. (*Id.*) I.R. continued to have difficulty sleeping. (*Id.*) He was disrespectful and had temper tantrums at home, in school and in the community. (*Id.*) He was aggressive with siblings and other family members. (*Id.*) In the current symptoms section of the report, I.R.'s father indicated that I.R. had severe school achievement and behavioral self-control symptoms. (R. 766.) I.R.'s father further stated that I.R. had moderate symptoms in school attendance, behavior in school and at home, receptive and expressive language, ability to sustain attention, interpersonal interactions, anxiety/nervousness,

anger, and depression/unhappiness. (*Id.*) Finally, I.R.'s father indicated that I.R. had no current symptoms with regard to compliance with social norms, self-care, physical complaints, appetite or eating problems, difficulty sleeping, violent behavior, isolation, destructive behavior, talking about/attempted suicide, or talking about harming others.[5] (*Id.*)

I.R.'s father rated the level of interference with I.R.'s functioning as low for I.R.'s daily routine, moderate for his social relationships and activities, and at a level between moderate and severe for his academic performance and emotional well being. (R. 766.) Although I.R.'s father found I.R. to be impulsive, he did not find him to be violent or have an anger problem, despite the temper tantrums I.R. had at home. (R. 769.) Morales diagnosed I.R. with ADHD based on his history and medical record and assigned I.R. a GAF score of 53 (moderate). (R. 771.) Morales also noted that I.R. suffered from asthma, and he assessed severe problems with I.R.'s primary support group and educational problems. (*Id.*) I.R. was admitted to NYPCC for outpatient treatment to address ADHD symptoms and to improve coping and decision-making skills, consequential thinking and academics. (R. 772.)

A chart summary reveals that I.R. returned to NYPCC for a therapy session on April 23, 2012 and for collateral sessions on April 23 and 30, 2012, respectively. (R. 759.) I.R. did not show up to his May 10, 2012 session. (*Id.*)

In a May 11, 2012 initial treatment plan report prepared by NYPCC therapist Diane Vaillancourt, M.A. ("Vaillancourt"), and co-signed by Dr. David Molina, I.R. was documented as suffering from the following problems: lack of focus in class, easily distracted, anger management, hyperactive, over-eating, and low grades. (R. 781-85.) I.R.'s strengths included

---

[5] Notably, I.R.'s father indicated in the current symptoms section that I.R. did not have difficulty sleeping, notwithstanding the fact that he informed Morales that one of the reasons that I.R. was returning to treatment was because I.R. continued to have difficulty sleeping. (R. 765, 766.) Moreover, although I.R.'s father indicated that I.R. did not talk about or attempt suicide, the report is clear that I.R. previously had been hospitalized for suicidal ideation. (*Id.*) These inconsistencies were not addressed further in this report.

being friendly and cooperative, making friends easily, and making eye contact. (R. 781.) He was assessed as having a low risk of harm to himself and no risk of harm to others. (R. 782.) The treatment plan was to consist of psychotropic medication, meeting with a psychiatrist 15 minutes once per month, verbal psychotherapy 30 minutes once per week with a therapist, and a collateral session 30 minutes once per month. (R. 783-84.) During the course of the proposed therapy, I.R. was to: (1) develop constructive ways of managing anger to improve impaired daily functioning, instead of resorting to uncontrolled outbursts; (2) improve academic functioning by sustaining attention during class; (3) learn social skills to facilitate social interactions with peers and establish a support network of peers; and (4) improve academic performance and pass all classes. (*Id.*) Before being discharged from this outpatient therapy program, I.R. needed to improve his grades, improve attention and decrease talking in class, express his anger appropriately, and express his feelings verbally. (R. 785.)

A chart summary reveals that I.R. received therapy on May 17, 2012, and did not show for a May 24, 2012 session. (R. 759.) He returned on May 31, June 7, and June 14, 2012. (*Id.*) He also did not show for sessions on June 21 and June 28, 2012, respectively. (*Id.*)

On July 5, 2012, Dr. Molina performed a psychiatric evaluation on I.R. (R. 754-58, 776-80.) Plaintiff reported that I.R. had no developmental milestone delays and that he had received occupational therapy as a baby due to weakness. (R. 754.) Plaintiff further stated that I.R. had a long history of psychiatric problems, including temper tantrums, anger issues, defiance, head banging, acting out when he did not get his way, outbursts, poor attention span, insomnia, restlessness, and excessive talkativeness and hyperactivity. (*Id.*) He was disorganized and did not appear to listen. (*Id.*) Dr. Molina noted that I.R.'s previous treatment had been discontinued at NYPCC because I.R. did not appear for numerous sessions. (*Id.*) Dr. Molina also noted that

I.R. had been treated with psycho-stimulants in the past and they had produced good results for him.  (*Id.*)

Dr. Molina's mental status examination revealed that I.R. was alert, fully oriented, and cooperative.  (R. 755.)  His daily living activities were intact, and his speech was coherent and goal directed.  (*Id.*)  I.R.'s mood was anxious, and his affect was somewhat restricted.  (*Id.*)  I.R. did not exhibit any thought process or content disorders and he had no auditory or visual hallucinations.  (*Id.*)  He had a decreased attention span, forgetfulness, and low average intelligence.  (*Id.*)  This examination further revealed that I.R. had no suicidal or homicidal ideation, and his insight and judgment were limited.  (*Id.*)  Dr. Molina diagnosed I.R. with ADHD based on his history and medical record, and assigned him a GAF score of 53 (moderate).  (R. 756.)  Dr. Molina also noted diagnoses of asthma and heart murmur for I.R.  (*Id.*)  Dr. Molina prescribed a trial of Seroquel and recommended that I.R. continue individual psychotherapy.  (R. 757-58.)  I.R. subsequently returned for therapy at NYPCC on July 12, 2012, did not appear for his session on July 19, 2012, but did appear for his July 27, 2012 session.  (R. 759.)

On July 31, 2012, Vaillancourt completed a treatment plan review, which was co-signed by Dr. Molina.  (R. 786-92, 793-99.)  I.R. was found to be working in session to express himself verbally without resorting to an outburst.  R. 786.  He was pleasant, friendly, talkative, could handle losing a game without becoming angry, and he communicated his needs and concerns appropriately.  (*Id.*)  I.R. was able to sustain attention for the entire session when he was focused on a game that he enjoyed.  (R. 787.)  I.R. also identified "not talking" and avoiding distraction by peers in class as a method to improve concentration during class.  (*Id.*)  However, Vaillancourt concluded that I.R. had not yet reached discharge criteria and that he needed to:  (1) learn to accept that he cannot get everything he wants; (2) cope with frustration in a healthier

way; (3) learn anger management techniques; and (4) improve his grades and social skills.  (R. 792.)

On August 9, 2012, Dr. Molina continued I.R.'s Seroquel prescription.  (R. 758.)  The chart summary also revealed that I.R. returned for collateral sessions at NYPCC on August 16, 2012 and September 6, 2012.  (R. 759.)

## DISCUSSION

### I.    Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. § 405(g).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1998).  The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (internal citations omitted).  The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A remand

by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999) (quotations omitted).

## II.    Standard Governing Evaluation of Disability Claims for Children

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the "PRWORA") revised the definition of disability for children seeking SSI. *Morris v. Barnhardt*, 2002 WL 1733804, at *4 (S.D.N.Y. July 26, 2002).

> Under the PRWORA, a disability exists for purposes of SSI benefits if a child under the age of eighteen: [1] has a medically determinable physical or mental impairment, [2] which results in marked and severe functional limitations, and [3] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months … [however,] no individual under the age of 18 who engages in substantial gainful activity … may be considered to be disabled.

*Id*.

In connection with the passage of the PRWORA, the SSA issued a new set of regulations under 20 C.F.R. Parts 404 and 416 that established a three-step process for determining whether an individual under the age of 18 is disabled. *Encarnacion ex rel. George v. Barnhart*, 331 F.3d 78, 84 (2d Cir. 2003). Under the three-step process, in order to find that an individual under the age of 18 is disabled, the ALJ must determine that: "(1) the child is not engaged in substantial gainful activity; (2) the child has an impairment or combination of impairments that is severe; and (3) the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of

20 C.F.R. § 404." *Id.*; *see* 20 C.F.R. § 416.924(a).

With respect to the third step in the evaluation process, "the ALJ must consider whether the impairment, alone or in combination with another impairment, medically equals, or functionally equals the listings." *Id.* (internal quotation marks omitted).[6] "Functional equivalency means that the impairment is of 'listing-level severity; i.e., it must result in marked limitations in two domains of functioning or an extreme limitation in one domain ….'" *Id.* (quoting 20 C.F.R. § 416.926a(a)) (internal quotation marks omitted). "A marked limitation is one that interferes seriously with the child's 'ability to independently initiate, sustain, or complete activities.'" *Id.* (quoting 20 C.F.R. § 416.926a(e)(2)(i)). The ALJ must consider how a child functions in his activities in terms of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) self-care; and (6) health and physical welfare. *Id.* *See* 20 C.F.R. § 416.926a(b)(1). "The regulations provide that a child must be found to be disabled if he or she has an impairment or impairments of 'listing-level severity,' that is, an 'extreme' limitation in one of these domains, or 'marked' limitations in two or more domains." *Encarnacion ex rel. George*, 331 F.3d at 84-85 (quoting 20 C.F.R. § 416.926a(a)). As noted above, I.R. was tested in all six of these domains.

## III.    The ALJ's Decision

Notwithstanding I.R.'s ADHD and PTSD diagnosis, and complaints of migraines, the ALJ found that I.R. did not have an impairment or combination of impairments that meets or

---

[6] "By regulation, the Commissioner [of Social Security] has set forth a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. For both adults and children, 'if an applicant satisfied the Listings, the applicant was presumed to be disabled, and did not have to prove "whether he [or she] actually can perform his [or her] own prior work or other work."'" *Hamedallah ex rel. E.B. v. Asrue*, 876 F. Supp. 2d 133, 141-42 (N.D.N.Y. 2012) (quoting *Lusher ex rel. Justice v. Commissioner of Social Security*, 2008 WL 2242652, at *6 (N.D.N.Y. 2008) and *Sullivan v. Zebley*, 493 U.S. 521 (1990), respectively).

medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart B, Appendix 1.  (R. 12.)  In considering I.R.'s symptoms, Social Security regulations require the ALJ to use a two-step process "to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical or other objective evidence." *Scitney v. Colvin*, 41 F. Supp. 3d 289, 303 (W.D.N.Y. 2014).  The ALJ must first consider "whether the medical evidence shows any impairment 'which could reasonably be expected to produce the pain or other symptoms alleged …'" *Id*. at 303-04 (quoting 20 C.F.R. § 404.1529(a)).  "Second, if an impairment is shown, the ALJ must evaluate the 'intensity, persistence, or functionally limiting effects' of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work."  *Id*. at 304 (quoting 20 C.F.R. § 404.1529(b)).  In the event that "the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the details of the case record as a whole."  *Id*.; *see* 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

With respect to this two step-process, the ALJ concluded that, while I.R.'s medically determinable impairments reasonably could be expected to produce I.R.'s alleged symptoms, Plaintiff's and I.R.'s statements concerning the intensity, persistence and limiting effects of these symptoms were not credible.  (R. 15.)  Moreover, the ALJ found that the statements were inconsistent with the determination that I.R. does not have an impairment or combination of impairments that functionally equals any of the listed impairments.  (*Id*.)

## IV.    Application

The Commissioner moves for judgment on the pleadings, seeking affirmance of the denial of I.R.'s benefits on the grounds that the ALJ applied the correct legal standards to determine that I.R. was not disabled and the ALJ's factual findings are supported by substantial

evidence. (*See generally* Defendant's Memorandum of Law ("Def. Mem. of Law"), Dkt. Entry No. 21.)

Plaintiff contests the ALJ's findings on the grounds that I.R. previously had received disability benefits and that those benefits were discontinued only because Plaintiff forgot to bring I.R. to a scheduled appointment. (Plaintiff's 04/14/2015 Letter, Dkt. Entry No. 16.) Plaintiff argues that I.R. is disabled and that his symptoms have worsened. (*Id*.) However, as the Commissioner correctly notes, the prior determination terminating I.R.'s benefits is not presently before this Court. (Def. Mem. of Law at 19.) With respect to the initial termination of disability benefits, Plaintiff was advised of her right to appeal that determination in December 2009. (R. 95-98.) Plaintiff also was advised that, if I.R. did not become eligible again for disability benefits, he had to file a new application and complete the entire childhood disability evaluation process. (R. 96.) Plaintiff admitted that she received this notice, but did not appeal the determination or file a new SSI application for I.R. until March 2011 due to her own personal issues. (R. 42-43.)

Furthermore, the Court lacks subject matter jurisdiction over an action to reopen a claim for disability benefits absent a challenge on constitutional grounds. *Dixon v. Chater*, 954 F. Supp. 58, 60 (E.D.N.Y. 1997). Here, Plaintiff does not assert a constitutional challenge to I.R.'s December 2009 denial of benefits. The Commissioner also correctly notes that Plaintiff cannot use this civil action to appeal the 2009 determination, which was not administratively appealed and, therefore, not a "final decision" subject to judicial review. *See* 42 U.S.C. § 405(g); (Defendant's Reply Memorandum of Law ("Def. Reply") at 1, Dkt. Entry No. 22.) Accordingly, I.R.'s previous receipt of disability benefits has no bearing on the Court's consideration of the instant appeal.

For the reasons set forth below, the Court concludes that the ALJ applied the appropriate legal standards and her decision is supported by substantial evidence.

**A. The ALJ Followed the Correct Legal Standard**

The ALJ followed the correct legal standard by applying the three-step analysis of 20 C.F.R. § 416.924(a).

**1. Substantial Gainful Activity ("SGA")**

SGA is defined by 20 C.F.R. § 416.972 as "work activity that is both substantial and gainful." 20 C.F.R. § 416.972; *see Morris*, 2002 WL 1733804 at *5, n. 7. "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). Whereas, gainful work activity is defined as "work activity that you do for pay or profit." 20 C.F.R. § 416.972(b). Because I.R. does not engage in any SGA, the ALJ appropriately proceeded to the second step of the analysis, which requires a determination of whether I.R. has a severe impairment or combination of impairments. *Morris*, 2002 WL 1733804, at *5.

**2. Severity of Impairments or Combination of Impairments**

The ALJ correctly determined that I.R. had a severe impairment in the form of ADHD. (R. 12.) Since there was a finding of severe impairment, the analysis must proceed to the next step, "which requires the ALJ to determine whether the impairment meets, medically equals, or functionally equals in severity the applicable listed impairment in appendix 1." *Morris*, 2002 WL 1733804, at *7; *see* 20 C.F.R. § 416.924(d).

**3. Impairment Does Not Meet, Medically Equal, or Functionally Equal the Severity of a Listing**

In order to determine medical or functional equivalency of a listing-level severity, the ALJ must consider how I.R. performed in the above-mentioned six domains of activity.

### a. Acquiring and Using Information

The domain of acquiring and using information concerns how well a child acquires, learns, and applies information. 20 C.F.R. § 416.926a(g)(2)(iv). The record shows that, while I.R. is somewhat behind his age cohort academically, this is due primarily to his ADHD and general difficulty focusing on tasks, as opposed to his ability to acquire and use information. (R. 634-638.) Notably, I.R.'s third grade teachers, Metz and Nodelman, reported that, despite some problems in this domain, none were rated as serious or very serious. (R. 150.) Thus, while I.R. may have some limitations academically, substantial evidence supports the ALJ's finding that I.R. had less than a marked limitation in this domain. (R. 15-16.)

### b. Attending and Completing Tasks

The appropriate functioning of a child in the domain of attending and completing tasks concerns how well the child is able to focus and maintain attention, and the child's diligence in beginning, following through and completing tasks. 20 C.F.R. § 416.926a(h)(2)(iv). The ALJ found that, while I.R. had a marked limitation in this domain, it was not an extreme limitation. (R. 16-17.)

Dr. Kudler, the state agency consultative psychiatrist who reviewed the evidence in I.R.'s file on June 10, 2011, concluded that I.R. had a less than marked limitation in this domain. (R. 636.) Generally, a treating physician's opinion is given controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004). However, the ALJ may rely upon the information and opinions gleaned from non-examining or treating sources to override the opinions of treating physicians. *Schisler v. Sullivan*, 3 F.3d 563, 567-68 (2d Cir. 1993) (a treating physician's opinion is granted controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence).

Here, there is substantial evidence in the record to support the ALJ's finding that I.R. had a marked, rather than a less than marked, limitation in this domain. I.R.'s inability to focus and complete tasks in a timely manner, as well as his susceptibility to distraction, has been a constant issue for I.R. throughout the course of his medical and academic evaluations. (R. 145, 150-51, 157, 169, 172, 173, 193.) Treatment records from the Guidance Center of Brooklyn Heights revealed that I.R. suffered from moderate symptoms in the ability to sustain attention. (R. 766.) Accordingly, the ALJ was correct to determine that I.R. exhibited a marked limitation in this domain.

### c. Interacting and Relating with Others

The domain of interacting and relating with others concerns, *inter alia*, a child's ability to initiate and sustain emotional connections with others, cooperate with others, comply with rules, and respond appropriately to criticism. 20 C.F.R. § 416.926a(j)(2)(iv). Substantial evidence in the record supports the ALJ's finding that I.R. had a less than marked limitation in this domain. (R. 17-18.) As the administrative record considered as a whole confirms, Metz and Nodelman properly determined that I.R. only had a very serious problem in taking his turn during a conversation. (R. 152.) In the other functional activities that comprise this domain, I.R. did not exhibit any serious or very serious problems. (*Id.*) Specifically, I.R.'s teachers noted that he responded well to changes of routine in the classroom, got along well with peers and teachers, and he exhibited great communication skills. (R. 145.)

I.R. testified at the hearing before the ALJ that he had friends at school, made new friends, and enjoyed playing games with his friends at lunch. Plaintiff's testimony corroborated I.R.'s testimony. Furthermore, Dr. Molina's mental status examination corroborated these findings because he concluded that I.R. was cooperative and friendly, made friends easily,

retained eye contact and had coherent speech. (R. 755.) Accordingly, the ALJ correctly concluded that I.R. exhibited only a marked limitation in this domain.

### d. Moving and Manipulating Objects

There is no evidence in the administrative record to suggest that I.R. exhibited any problem in the domain of moving and manipulating objects. Therefore, the ALJ correctly concluded that I.R. has no limitation in this domain.

### e. Self-Care

The domain of self-care concerns how well a child maintains a healthy emotional and physical state, including how well the child gets their physical and emotional wants and needs met in appropriate ways; how well the child copes with stress and changes in their environment; and whether the child takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). Substantial evidence supports the ALJ's finding that I.R. had a less than marked limitation in this domain. Dr. Kudler also concluded that I.R. exhibited a less than marked limitation in this domain. (R. 637.) I.R.'s teachers noted only that I.R. demonstrated a serious or very serious problem with being patient when necessary and diligent in taking his needed medications. (R. 154.) Plaintiff also stated that I.R. did not have any problems with self-care, other than occasionally having to be forced to take a shower. (R. 139.) Accordingly, the ALJ correctly concluded that I.R. has no limitation in this domain.

### f. Health and Physical Well-Being

There is no evidence in the administrative record to suggest that I.R. exhibited any problem in the domain of health and physical well-being. Therefore, the ALJ correctly concluded that I.R. has no limitation in this domain.

In finding that I.R. did not demonstrate any disability, the ALJ appropriately considered Plaintiff's and I.R.'s statements concerning the intensity, persistence and limiting effects of his symptoms, and correctly concluded that they were not credible. (R. 12-15.) In order to show the existence of an underlying condition, a claimant must present sufficient medical signs and findings, and the condition must reasonably be expected to produce the symptomatology alleged. 20 C.F.R. § 416.929(a) and (b). When a claimant's statements about his symptoms and limitations suggest a greater restriction of function than is demonstrated by the objective medical and other evidence, the Commissioner must consider the claimant's daily activities, the nature, location, onset, duration, frequency, and intensity of the pain or other symptoms, factors precipitating or aggravating the symptoms, the type, dosage, effectiveness, and side effects of medication, any other treatment, and any other measures used to relieve the pain or other symptom. 20 C.F.R. § 416.929(c)(3).

The ALJ properly considered evidence of I.R.'s extracurricular activities from school and medical sources. I.R. stated that he played sports such as basketball and football and that he enjoyed playing video games. (R. 53-54.) Dr. Molina found that I.R.'s activities of daily living were intact. (R. 755.) Plaintiff also reported that I.R.'s medications produced no adverse side effects and the records from NYPCC indicated that his medications were helpful. (R. 139, 754, 765, 775.)

Accordingly, because substantial evidence establishes that I.R. did not have an extreme limitation in any single domain of functioning, or marked limitations in any two domains, his impairments were not functionally equivalent to a listed impairment.

**CONCLUSION**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted and this appeal is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
        March 30, 2016

                                        _____/s/_____
                                        DORA L. IRIZARRY
                                        United States District Judge